**IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF GEORGIA
ATLANTA DIVISION**

_____
)
HAMEED ALBURKAT and ALGHADEER )
BAKERY & MARKET, INC., on behalf of )
themselves and all others similarly situated, )
)
     Plaintiffs, )
)   CIVIL ACTION
v. )
)   NO. 1:16-cv-03627-AT
WORLDPAY US, INC., )
)
     Defendant. )
_____)

## AMENDED CLASS ACTION COMPLAINT

Plaintiffs Hameed Alburkat and Alghadeer Bakery & Market, Inc., on behalf of themselves and the class of persons and entities preliminarily defined below, file this Amended Class Action Complaint against Defendant WorldPay US, Inc. ("WorldPay" or "Defendant") pursuant to Federal Rule of Civil Procedure 15(a)(1)(B).

## NATURE OF THE CASE

1.

This is a civil action seeking monetary damages and restitution from Defendant arising from its improper business practices in connection with the

provision of services relating to payments via credit and debit cards for merchants ("merchant services" or "payment processing services").

2.

In today's business world, the vast majority of merchants accept payment for goods and services via credit and debit cards.  In order to accept this method of payment, the merchant must utilize merchant services.

3.

Merchants rely on the companies that provide merchant services to do so at a fair price and in accordance with fair and appropriate terms.  Fees for merchant services are likely the third highest expense most merchants incur, following labor and product costs.

4.

Merchant services are provided through a system involving many parties. For instance, in addition to the merchant that receives payment and the customer who provides such payment, the processing of a card transaction is likely to involve (a) the bank that issued the credit or debit card to the customer (e.g., Chase or Bank of America); (b) the card network through which the transaction is processed (e.g., Visa, MasterCard, Discover, or American Express); (c) the company that actually processes the payment (e.g., WorldPay); (d) the payment

processor's member bank (e.g., Wells Fargo, Citizens Bank, etc.); (e) the company that sells or leases the payment processing equipment to the merchant; and (f) the Independent Sales Organization ("ISO") that actually enrolls merchants in payment processing services.

5.

The number of involved parties and moving pieces make it very difficult for small merchants to understand the process and/or how much it will cost.

6.

Such front-end explanation and clarity is critical because merchants typically sign long-term deals for merchant services that are either non-cancellable or cancellable only with hefty early termination penalties.

7.

Unfortunately, some ISOs and payment processors take advantage of their position. They induce "mom and pop" merchants to purchase merchant services without disclosing fees they know the merchant will be charged. They also bury unconscionable and self-serving contractual provisions in the middle of fine print form contracts.

8.

ISOs engage in such tactics because they receive substantial commissions and payments from payment processors simply by locking merchants into long term deals.

9.

Defendant WorldPay is a payment processor.  It has relationships with many ISOs whereby the ISOs' sales representatives are authorized representatives of WorldPay.  WorldPay mandates the use of its own form contracts and then handles the payment processing for all merchants – regardless of which ISO signed them up – on the same software platform.

10.

This case challenges WorldPay's business practices.  Specifically, WorldPay induces merchants to enter business relationships by promising it will charge them low, agreed-upon rates and fees for payment processing services.  Then WorldPay locks merchants into long-term, non-negotiable, form contracts.  The fine print terms that WorldPay intends to largely govern the contractual relationship are set forth in a separate document.   In this way merchants see and execute one document, but are purportedly bound by another document.  As explained in detail herein, through these terms and conditions WorldPay seeks to backtrack from the

agreed-upon fees and rates that have actually been reviewed and approved by the merchant and immunize itself from liability if the merchant learns of WorldPay's improper conduct. Such provisions are illusory, lack mutuality, violate public policy, and are unconscionable.

11.

After the merchant and a principal guarantor sign the contract and the parties begin to do business, WorldPay raises rates and imposes both new, unanticipated payment processing fees as well as fees the contract specifically indicated would not be charged. These fees violate the contract. Such fees are also violative of the covenant of good faith and fair dealing, which applies to such contracts under Georgia law, including pursuant to the Uniform Commercial Code which has been adopted by Georgia.

12.

Finally, in the alternative – and if breach of contract claims are inapplicable because the form contracts are deemed unenforceable – it would constitute unjust enrichment for WorldPay to retain the improper fees. Thus, even if breach of contract principles do not warrant recovery, Plaintiffs (and the Class they represent) should be made whole.

## PARTIES

### 13.

Plaintiff Hameed Alburkat ("Mr. Alburkat") is an individual and the principal owner of Plaintiff Alghadeer Bakery & Market, Inc. ("Alghadeer Bakery & Market"). Pursuant to the Agreement, Mr. Alburkat was obligated personally because he was forced by the WorldPay sales agent to sign as a guarantor for Alghadeer Bakery & Market. Pursuant to numerous terms of Defendant's contract, Mr. Alburkat may be bound to pay substantial monies to WorldPay.

### 14.

Plaintiff Alghadeer Bakery & Market is a Michigan corporation with its principal place of business at 7497 Greenfield Road, Detroit, Michigan 48228. Alghadeer Bakery & Market is a merchant that owns and operates a small market and bakery.

### 15.

Defendant WorldPay US, Inc. is the United States subsidiary of WorldPay Group PLC, which is a British company headquartered in London and traded on the London Stock Exchange. The majority of WorldPay is owned by Bain Capital and Advent International, two private equity firms known for maximizing profits at their portfolio companies. The U.S. subsidiary of WorldPay Group PLC is a

Georgia corporation with its principal place of business at 201 17th Street NW, Suite 1000, Atlanta, Georgia, 30363.  WorldPay holds itself out as a global leader in payment processing technology and solutions for its merchant customers and markets itself as a provider of reliable and secure proprietary technology platforms that enable merchants to accept a vast array of payment types.  WorldPay has been served through its registered agent Corporation Service Company at 40 Technology Parkway South, Suite 300, Norcross, Georgia, 30092.

## JURISDICTION AND VENUE

### 16.

This case was originally filed by Plaintiffs in the Superior Court of Fulton County, Georgia.  Although such court was specifically listed by WorldPay in its own form contract as a proper venue for this lawsuit, WorldPay removed the case to federal court.  Despite Plaintiffs' preference for state court, they do not dispute that this Court also has proper jurisdiction.  Jurisdiction is proper in this Court pursuant to 28 U.S.C. § 1332(d)(2) because there are more than 100 potential Class members and the aggregate amount in controversy exceeds $5 million exclusive of interest, fees, and costs, and at least one Class member is a citizen of a state other than Georgia.

17.

This Court has personal jurisdiction over Defendant because it conducts substantial business within the State of Georgia.  Indeed, WorldPay's headquarters are located in Atlanta.  As such, it has significant, continuous, and pervasive contacts in Georgia.

18.

Venue lies within this judicial district under 28 U.S.C. § 1391 because Defendant has its headquarters here and conducts substantial business in this district, and a substantial portion of the events, omissions, and acts giving rise to the claims herein occurred in this district.

19.

Venue and jurisdiction are also proper in this Court pursuant to the terms of WorldPay's form contract, which states:

> In connection with any dispute relating to this Agreement, Customer and all individuals executing this Agreement in any capacity hereby consent to the exclusive jurisdiction of, and venue in, the courts in Atlanta, Georgia or Fulton County, Georgia.

Terms § 11.3.

## COMMON FACTUAL ALLEGATIONS

A.  <u>WorldPay Induces Merchants to Enter Long Term Contracts Via Promises of Transparent, Low Cost Pricing.</u>

20.

WorldPay retains ISOs such as Elite Management Services ("Elite") to market its services for processing credit and debit card payments.

21.

These ISOs do ***not*** perform the actual payment processing services.  Rather, such services are performed only by WorldPay.

22.

The ISOs' function is essentially to broker deals between merchants and WorldPay in exchange for a percentage of the processing fees that WorldPay charges to merchants.

23.

ISOs approach merchants and attempt to induce them to switch to WorldPay from their current card processor through promises of transparent, low cost pricing.

24.

Merchants are attracted by promises of being able to save money by reducing the costs they will pay for payment processing services if they switch

providers.   This approach is very appealing to merchants because payment processing is a substantial business expense for them.

25.

The ISOs present merchants with WorldPay's form, three-page Customer Processing Agreement ("Agreement").  This Agreement sets forth, in a clear and conspicuous manner, the rates and fees merchants will pay if they process card payments through WorldPay.

26.

If a merchant is interested in doing business with WorldPay for the clearly disclosed fees and rates, the ISO has the merchant and a personal guarantor sign the Agreement.  The personal guarantor is obligated to meet payment obligations if the merchant does not do so and is subject to suit by WorldPay.  The Agreement requires such guarantor to "unconditionally guarantee[] to RBS Citizens, N.A. and WorldPay US, Inc. the full payment of all obligations arising out of or in furtherance of the Agreement and to pay RBS Citizens, N.A. or WorldPay US, Inc. all expenses incurred in collecting such obligation."

27.

The Agreement is bereft of any indication that (a) the agreed-upon fees and rates will increase (nor would increases be expected since technology and

10

competition has actually driven down costs for payment processing), (b) new, un-disclosed fees and rates will be charged, (c) fees will be charged for transactions that the contract indicated would not occur, (d) the Agreement was for a several year term, or (e) early termination fees would apply if the merchant canceled before such term expired.

28.

Such terms unquestionably are important to merchants and would impact their decision to do business with WorldPay.

29.

Instead of conspicuously setting forth such critical provisions in the Agreement, WorldPay buries them in a separate document, entitled "Terms and Conditions of Customer Processing Agreement" ("the Terms").  Multiple versions of the Terms are available online.  WorldPay claims a version dated "4/13" applied although the version labeled "10/13" was in place at the time Plaintiffs signed up with WorldPay in December of 2013.  Discovery will show the time periods each version was used by WorldPay.  Although Plaintiffs were not provided with the Terms by WorldPay's sales agent, and discovery will show that the Terms are very rarely provided to merchants, the Agreement states that those signing are bound by the Terms.

11

B.   <u>WorldPay Buries Absurd Provisions in the Fine Print Terms that Purport to Allow It to Charge Whatever It Wants Without Fear of Legal Action.</u>

30.

The Agreement states that the merchant and guarantor are obligating themselves to the Terms, which WorldPay knows full well merchants are unlikely to have received or read.  Indeed, given the dense legalese of the Terms, which is spread over as many as 20 pages of text (depending on the version and format), there is zero chance of a merchant actually having read the Terms.

31.

The Terms are a boilerplate form that is not negotiable.  Even if merchants could read and understand the Terms, WorldPay would not negotiate.  They are a take-it-or-leave-it proposition.

32.

The Terms represent a unilateral effort by WorldPay to (a) backtrack from the rates and fees set forth in the Agreement and (b) immunize itself from liability for improper practices.

33.

For example, although the Terms state that the processing charges will conform to the Agreement (*id.* at § 5.1), they also purport to give WorldPay the right "to modify, amend, or supplement the fees set forth on the Agreement" for

12

any reason (or no reason at all).  *Id.* at § 11.9.  Boiled down to its core, this provision purports to give WorldPay unlimited discretion to charge whatever it wants for payment processing services even if such fees and rates are vastly different and higher than what is clearly set forth in the Agreement.

34.

By way of additional examples, the Terms can be read to (a) limit the statute of limitations for obtaining reimbursement for WorldPay overcharges to 30 days (*id.* at § 7.5), (b) limit the total amount of WorldPay's liability to three months of fees (*id.* at § 9.3), and (c) require merchants to pay WorldPay's attorney fees whenever it "employs legal counsel," regardless of whether WorldPay wins or loses a dispute (*id.* at § 11.4).  Plaintiffs disagree with WorldPay's interpretations of these provisions, but the Court may be called upon to determine whether WorldPay is correct and whether such terms are enforceable.

35.

WorldPay uses these provisions, as well as the hefty early termination fees, as tools to discourage aggrieved merchants from terminating their relationships with WorldPay or pursuing legal action for overcharges.

36.

These provisions violate public policy, lack mutuality, are unconscionable, and are otherwise void and unenforceable.

C.    WorldPay Raises Fees and Rates and Imposes New Categories of Fees Not Reflected in the Agreement.

37.

After WorldPay starts processing payments, it charges fees and rates that are inconsistent with the agreed-upon fees and rates that are set forth in the Agreement.

38.

Indeed, it increases agreed-upon rates and fees and also adds new categories of fees that either were not referenced in the Agreement or were explicitly excluded in the Agreement.

**INDIVIDUAL FACTUAL ALLEGATIONS**

39.

In December of 2013, Mr. Alburkat and Alghadeer Bakery & Market were approached by an individual named Ali Bazzy, the authorized sales representative for WorldPay.  The representative worked with ISO Elite but was fully authorized to represent WorldPay.  The Agreement, for instance, refers to such persons as "WORLDPAY'S SALES REPRESENTATIVE."  *See* Agreement, p. 3.

14

40.

The sales representative showed Mr. Alburkat that his store could save a substantial amount in merchant services costs by switching his payment processing to WorldPay.

41.

The WorldPay representative explained the rates that Alghadeer Bakery & Market would pay in processing were much lower than what it was then paying.

42.

The WorldPay representative presented Plaintiffs with an Agreement which specifically identified the fees and rates they would be charged.  Based on the fees and rates shown in the Agreement, Mr. Alburkat expressed interest in switching to WorldPay.

43.

By way of example, the Agreement explained that Plaintiffs would be charged "cost-plus pricing."  Under this method of pricing, the interchange rates and the assessments set by the card networks are passed through to the merchant *at cost* and the merchant is separately charged an additional amount representing the payment processing fee (i.e., the interchange rates and assessments together comprise the "cost" in "cost-plus" pricing and the "plus" is WorldPay's fee).

44.

The Agreement reflects that Plaintiffs will pay the standard card network interchange rates and assessments plus a rate of 0.3% and $0.12 per transaction.

45.

By way of additional example, the Agreement disclosed that Plaintiffs would be charged specified recurring fees, including a $5.00 monthly administrative fee and a "Batch Header Fee" of $0.10 per occurrence.

46.

The agreed-upon payment processing rates and recurring fees found in the Agreement did not include any type of annual fee. Such fees are certainly not contemplated in the Agreement since all services are paid either on a per transaction or per month basis.

47.

The Agreement also specifically indicated that Plaintiffs would not be charged processing fees for American Express transactions. *See* Agreement, p. 1 (box to "opt-out of American Express" is checked and associated fees are left blank). *See* Agreement, p. 1. It is quite common for merchants to opt-out of American Express transactions, based on the higher fees associated with American

Express.  In such an instance, WorldPay's Agreement provides that such transactions will not be processed and no fees assessed.

48.

Plaintiffs were satisfied with the terms, rates, and fees explicitly set forth in the Agreement and decided to do business with WorldPay.

49.

On December 18, 2013, Plaintiffs signed the Agreement and began doing business with WorldPay.

50.

After the parties' relationship commenced, it became clear that the agreed upon pricing was not being followed.

51.

By way of example, WorldPay did not adhere to its promise of imposing "cost-plus pricing" as identified in the contract.  Rather than pass through the card network interchange rates and assessments at cost, WorldPay inflated them.  Moreover, WorldPay also inflated its own fees above and beyond the 0.3% and $0.12 per transaction rates identified in the contract.  The true cost of WorldPay's services was radically higher than the contracted for rates.

52.

WorldPay also inflated the identified recurring fees.  By way of example, even though the contract explicitly stated that Plaintiffs would be charged a $5.00 monthly administrative fee and a "Batch Header Fee" of $0.10 per occurrence, beginning in late 2015 WorldPay charged a monthly administrative fee of $9.99 and a "Batch Header Fee" of $0.25 per occurrence.  Once again, based largely on improved technology and increased competition, fees and costs for payment processing have been gradually declining for several years.

53.

Further, even though the contract did not provide for an annual fee, Plaintiffs were charged an annual fee of $159.00 by WorldPay in late 2015.  Such fee bore no relation to any new costs or expenses of WorldPay but rather was designed to simply add directly to WorldPay's bottom line profit at the expense of its customers.

54.

Plaintiffs were also charged fees and rates in conjunction with American Express transactions, even though the Agreement explicitly stated that no such charges would be imposed.

55.

Upon discovering these and other improper charges, Plaintiffs demanded that all payment processing services be terminated.

56.

Plaintiffs were informed, in writing, that in order to terminate the contract they would be required to pay an early termination fee of $495 and pay an additional $260 to cover WorldPay's expected income loss through the end of the contract term.

57.

Plaintiffs were unwilling to pay WorldPay's early termination and lost profit fees. The $495 which WorldPay demanded for an early termination fee was much greater than the applicable $95 early termination fee specified in the Terms (§ 10.3(c)). Moreover, based on the various added fees and increases in existing rates and fees, WorldPay should have waived any applicable early termination fees. Plaintiffs have lost hundreds (if not thousands) of dollars as a direct result of WorldPay's improper charges.

58.

WorldPay will likely attempt to defend its conduct by arguing that it had the contractual discretion to increase fees or impose new fee categories. However, as

explained earlier, the broad "change in terms" provision is illusory, lacks mutuality, violates public policy, is unconscionable, and is thus unenforceable. Moreover, good faith and fair dealing constrains WorldPay's ability to use its discretion to add fees which were not contemplated by the parties. For example, although a contract may leave discretion to create a new fee, and thereby profit one party to the other party's detriment, good faith and fair dealing precludes such improper conduct.

59.

Thus, even if its self-granted ability to mark up rates and create new fees is enforceable, Defendant is bound to exercise its contractual discretion in good faith. WorldPay's manipulation of Plaintiffs' fees and charges was done for no other reason than to increase profits. This does not comport with good faith and fair dealing.

60.

WorldPay may also argue that its billing manipulations are proper because it provided Plaintiffs with advance notice of such changes. However, Plaintiffs were not provided with advance notice of many of the fee increases and new charges they suffered during the course of their relationship. Moreover, the form, format, and content of the statement notices given by WorldPay for *some* of the charges at

20

issue were insufficient to provide Plaintiffs with actual notice of the increases and were therefore ineffective.  Once again, even where Plaintiffs had notice, they were not allowed to terminate their account under the self-serving verbiage of the Terms and in accordance with the improper business practices of WorldPay.

61.

Relying on Section 7.5 of the Terms, WorldPay claims that Plaintiffs failed to properly dispute any billing irregularities within 30 days of their receipt of the statements containing such irregularities.  Section 7.5, however, is properly read to only deal with deficiencies in the processing of actual transactions.  For example, it is intended to deal with a situation where a purchase transaction that the merchant ran in the amount of $100 does not even appear on the statement, or where such transaction shows up for $10, as opposed to $100.  Section 7.5 is plainly not intended to deal with WorldPay's markups and charges separate from processed transactions.

62.

If interpreted as Defendant suggests, however, this provision would essentially attempt to reduce a six-year breach of contract statute of limitation to 30 days and, for this and other reasons, is unenforceable under Georgia law.

21

63.

Even so, some of the charges about which Plaintiffs complain (e.g., American Express charges, inflated administrative and batch header fees, inflated interchange and access fees, etc.) were indeed disputed in writing within 30 days of Plaintiffs' receipt of the July 2016 statement containing such charges. *See* Complaint (filed August 29, 2016 and disputing such charges) and Affidavit of Service on WorldPay (served August 30, 2016).

64.

The voluntary payment doctrine also does not apply here. Indeed, by the time Plaintiffs received statements notifying them of the prior month's payment processing charges, WorldPay had already taken such amounts from Plaintiffs' bank account. Indeed, all "card fees" (i.e., cost-plus pricing) are automatically debited by WorldPay on the days they are assessed. Moreover, all separate, miscellaneous fees (e.g., administrative fees, batch header fees, etc.) are automatically debited by WorldPay on the first day of the following month. Thus, all fees are charged and taken *before* statements are delivered (and Plaintiffs receive notice of such fees).

65.

For example, in early January 2016, Plaintiffs received a statement notifying them that WorldPay had charged them a total of $196.15 in card fees and $36.52 in miscellaneous fees for December 2015.  The statement notes that the card fees were taken from Plaintiffs' account from December's deposits and the miscellaneous fees were taken on January 1, 2016.  Plaintiffs thus were unaware of the nature and amount of December 2015 fees and charges *before* WorldPay had already taken them from Plaintiffs' bank account.

66.

Plaintiffs also have another ongoing dispute with WorldPay concerning Defendant's refusal to "unlock" Plaintiffs payment terminal, even though WorldPay has no ownership interest in the terminal and has absolutely no contractual right to continue to assert control over it.  WorldPay's software includes this lock-out feature which WorldPay uses to discourage merchants from leaving its payment processing service.  If discovery shows widespread abuse of the lock-out feature by WorldPay, Plaintiffs may seek to include claims as to this improper practice as well.

67.

Plaintiffs' experiences with WorldPay are not isolated, but rather are illustrative of Defendant's improper business practices towards its customers.

## CLASS ALLEGATIONS

68.

Plaintiffs bring this class action on behalf of themselves and all those meeting the following class definition:

> All United States persons or entities that were charged unauthorized amounts for payment processing services by WorldPay.

The Class will include WorldPay customers who were not signed up through Elite. WorldPay used a substantively identical Agreement and the same Terms regardless of which ISO signed up the customer.  It also used the same automated and standardized practices to markup fees and charges regardless of sales agent.  Thus, there is no reason to distinguish between customers signed up through Elite, or any other authorized agent of WorldPay.

69.

Plaintiffs reserve the right to modify or amend the definition of the proposed Class, or add other proposed classes or subclasses, before the Court determines whether certification is appropriate and as the Court may otherwise allow.

70.

Excluded from the Class are Defendant, its parents, subsidiaries, affiliates, officers, and directors, any entity in which Defendant has a controlling interest, all customers who make a timely election to be excluded, and all judges assigned to hear any aspect of this litigation, as well as their immediate family members.

71.

The time period for the Class is the number of years immediately preceding the date on which this Complaint is filed as allowed by the applicable statute of limitations, going forward into the future until such time as Defendant remedies the conduct complained of herein.

72.

The proposed Class meets all requirements for class certification.  The members of the Class are so numerous that joinder is impractical.  The Class consists of, at the very least, thousands of members and the identity of those persons and entities is within the knowledge of Defendant and can be ascertained by resort to WorldPay's records.

73.

The claims of the representative Plaintiffs are typical of the claims of the Class.  Plaintiffs, like all other members, were victimized by WorldPay's improper

practices.  Moreover, Plaintiffs, like all members, have incurred monetary damages as a result of WorldPay's misconduct.  Further, they are subject to the Agreement and the Terms as are all members of the proposed Class.  Furthermore, the factual basis of Defendant's misconduct is common to all members of the Class, and represents a common thread of conduct resulting in injury to all members.

74.

There are numerous questions of law and fact common to the Class and those common questions predominate over any questions affecting only individual Class members.

75.

Among the questions of law and fact common to the Class are:

a. Whether WorldPay used substantively the same contract with all ISOs during any given time period;

b. What form of its contract was utilized by WorldPay during each phase of the Class Period;

c. When did WorldPay begin its assessment of each improper charge;

d. Which charges were unauthorized;

e. Did merchants receive any tangible benefit from the improperly assessed fees;

f.     Did WorldPay require merchants to enter the same standardized Agreement and/or Terms;

g.     Did WorldPay's contract documents include unconscionable or otherwise unenforceable provisions, including but not limited to those purporting to shorten the statute of limitations, limit Defendant's liability, require early termination fees, require payment of Defendant's attorney's fees, and allow Defendant to disregard the agreed upon fees and charges;

h.     Did WorldPay breach contractual provisions in assessing improper charges;

i.     Did WorldPay breach the covenant of good faith and fair dealing through its billing practices; and

j.     Was WorldPay unjustly enriched through its improper billing practices.

76.

Other questions of law and fact common to the Class include:

a.     The proper method or methods by which to measure damages, and

b.     The equitable relief to which the Class may be entitled.

77.

Plaintiffs' claims are typical of the claims of other members of the Class in that they arise out of the same wrongful policies and practices and the same or substantially similar unenforceable provisions of the contract documents. Plaintiffs have suffered the harm alleged and have no interests antagonistic to the interests of any other member of the Class.

78.

Plaintiffs are committed to the vigorous prosecution of this action and have retained competent counsel experienced in the prosecution of class actions. Accordingly, Plaintiffs are adequate representatives and will fairly and adequately protect the interests of the Class.

79.

A class action is superior to other available methods for the fair and efficient adjudication of this controversy.  Since the amount of each individual Class member's claim is small relative to the complexity of the litigation, and due to the financial resources of WorldPay, most Class members could not afford to seek legal redress individually for the claims alleged herein.  Therefore, absent a class action, the Class members will be unable to obtain redress for their losses and Defendant's misconduct will have occurred without remedy.

80.

Even if Class members themselves could afford such individual litigation, the court system could not. Individualized litigation would significantly increase the delay and expense to all parties and to the Court. Individualized litigation would also create the potential for inconsistent or contradictory rulings. By contrast, a class action presents far fewer management difficulties, allows claims to be heard which might otherwise go unheard because of the relative expense of bringing individual lawsuits, and provides the benefits of adjudication, economies of scale, and comprehensive supervision by a single court.

81.

The prosecution of separate actions by individual Class members would create a risk of inconsistent and varying adjudications concerning the subject of this action, which adjudications could establish incompatible standards for Defendant.

82.

Defendant has refused to correct its conduct and such inaction is generally applicable to the Class, thereby making appropriate injunctive relief or corresponding declaratory relief with respect to the Class as a whole. Specifically, WorldPay continues to knowingly overbill the Class and to enforce unconscionable

or otherwise unenforceable contractual provisions.  Class-wide declaratory and/or injunctive relief is appropriate to put an end to these illicit practices.

## REQUESTS FOR RELIEF

## COUNT ONE

## DECLARATORY RELIEF

83.

Plaintiffs repeat paragraphs 1 through 82 above.

84.

Class-wide declaratory relief is appropriate where a Defendant has "acted or refused to act on grounds that apply generally to the class."

85.

Defendant has increased agreed-upon fees and rates and attempted to immunize itself from liability for its practices by burying provisions in the adhesive Terms that purport to make it as difficult, dangerous, and costly as possible for merchants to obtain relief from Defendant's overbilling practices. Such clauses include but are not limited to those which – under WorldPay's strained interpretations – purport to:

a.    give WorldPay the right "to modify, amend, or supplement the fees set forth" in the Agreement for any reason (or no reason at all) (Terms § 11.9);

b.    limit the statute of limitations for obtaining reimbursement for WorldPay overcharges to 30 days (*id.* at § 7.5);

c.    limit the total amount of WorldPay's liability to three months of fees (*id.* at § 9.3); and

d.    require merchants to pay WorldPay's attorney fees whenever it "employs legal counsel," regardless of whether WorldPay wins or loses a subject dispute (*id.* at § 11.4).

86.

Although Plaintiffs contend that the foregoing terms are properly interpreted in a more customer-friendly fashion (*e.g.*, ¶ 61, *supra*), to the extent WorldPay disagrees and seeks to interpret such provisions in the manner described above, such provisions should be deemed unenforceable on multiple grounds, including because they are illusory, lack mutuality, and violate public policy.

87.

Moreover, considering the great business acumen and experience of Defendant in relation to Plaintiffs and the members of the Class, the great disparity

31

in the parties' relative bargaining power, the inconspicuousness and incomprehensibility of the contract language at issue, the oppressiveness of the terms, the commercial unreasonableness of the contract terms, the purpose and effect of the terms, the allocation of the risks between the parties, and similar public policy concerns, these provisions are unconscionable and, therefore, unenforceable as a matter of law.  This is especially true with respect to Plaintiff Mr. Alburkat, an individual consumer.  Mr. Alburkat is obligated to pay any obligations which Alghadeer Bakery & Market cannot cover.  If WorldPay's interpretations are affirmed and such provisions are deemed enforceable, Plaintiffs may be liable for hundreds of thousands of dollars.  Alghadeer Bakery & Market cannot pay those amounts and Mr. Alburkat, as guarantor, will be obligated to do so.

88.

Thus, a judicial declaration is necessary and appropriate so the parties may ascertain their rights, duties, and obligations with respect to these provisions.

89.

The Court should use its equitable powers to declare these provisions to be unenforceable.

## COUNT TWO

## BREACH OF CONTRACT INCLUDING BREACH OF THE COVENANT OF GOOD FAITH AND FAIR DEALING

90.

Plaintiffs repeat paragraphs 1 through 82 above.

91.

Plaintiffs and Defendant have contracted for merchant processing services. As described above, the actions taken by WorldPay have violated the specific terms of its contract with merchants.  WorldPay is liable for the losses of Plaintiffs and the Class that have resulted from its breaches of contract.

92.

WorldPay violated the contract by assessing improper charges not provided for in the contract, to include improperly inflated charges, additional fees not even mentioned in the contract, and charges which should have been waived, and by unilaterally marking up agreed-upon fees and charges without legal basis and without proper notice.  Thus, WorldPay has breached the express terms of its own form contract.

93.

Plaintiffs and the Class have performed all, or substantially all, of the obligations imposed on them under the contracts, or those obligations have been waived by WorldPay.

94.

Plaintiffs and members of the Class sustained damages as a result of WorldPay's breaches of contract.

95.

Pursuant to WorldPay's contract:

> This Agreement shall be governed by and construed in accordance with the laws of the State of Georgia without giving effect to any choice or conflict of law provision or rule (whether of the State of Georgia or any other jurisdiction) that would cause the application of the laws of any jurisdiction other than the State of Georgia.

Terms § 11.3.  Thus, the elements of breach of contract are identical for all members of the Class.

96.

Georgia law also imposes upon each party to a contract the duty of good faith and fair dealing.  Good faith and fair dealing, in connection with executing contracts and discharging performance and other duties according to their terms, means preserving the spirit – not merely the letter – of the bargain.  Put differently,

the parties to a contract are mutually obligated to comply with the substance of their contract in addition to its form.  Evading the spirit of the bargain and abusing the power to specify terms constitute violations of good faith and fair dealing in the performance of contracts.

97.

Subterfuge and evasion violate the obligation of good faith in performance even when an actor believes his conduct to be justified.  A lack of good faith may be overt or may consist of inaction, and fair dealing may require more than honesty.

98.

By charging fees that are inconsistent with those laid out in the contract, including but not limited to increasing the amounts of agreed-upon fees, imposing fees that the Agreement stated would not be charged, or imposing new categories of fees not referenced in the Agreement, WorldPay has violated the spirit of the contract and thus breached the covenant of good faith and fair dealing.  Even if WorldPay believed that it had given itself contractual discretion to increase markups and fees, or add new fees, such discretion is constrained by good faith and fair dealing under Georgia law and Defendant's actions do not comport with this duty.

35

99.

Plaintiffs and the Class have performed all, or substantially all, of the obligations imposed on them under the contract.  There is no excuse or defense for WorldPay's conduct under Georgia law.

100.

Plaintiffs and members of the Class sustained damages as a result of WorldPay's direct breaches of the contract and Defendant's breaches of the covenant of good faith and fair dealing.  As such, all elements for a successful claim under Georgia law have been satisfied.

## COUNT THREE

## UNJUST ENRICHMENT

101.

Plaintiffs repeat paragraphs 1 through 82 above.

102.

This Count is brought only in the alternative to Plaintiffs' claims for breach of contract, including good faith and fair dealing.  Indeed, if the contract is found to be void or unenforceable (¶¶ 83-89, *supra*), WorldPay must not be allowed to keep its ill-gotten gains.  Under Georgia law, unjust enrichment is appropriate under such circumstances.

36

103.

As alleged herein, WorldPay was unjustly enriched at the expense of Plaintiffs and the other members of the Class, who were grossly and inequitably overcharged for payment processing services.

104.

Plaintiffs and the other members of the Class were unjustly deprived of money obtained by Defendant as a result of the improper and excessive fees that WorldPay charged to and collected from Plaintiffs and the other Class members.

105.

It would be inequitable and unconscionable for Defendant to retain the profit, benefit, and other compensation obtained from Plaintiffs and the other members of the Class as a result of their wrongful conduct alleged in this Amended Complaint.

106.

Plaintiffs and the other Class members are entitled to seek and do seek restitution from Defendant as well as an order from this Court requiring disgorgement of all profits, benefits, and other compensation obtained by Defendant by virtue of its wrongful conduct.

WHEREFORE, Plaintiffs Hameed Alburkat and Alghadeer Bakery & Market, on behalf of themselves and the proposed Class, request that this Court:

(a)     Certify this case as a class action pursuant to Federal Rule of Civil Procedure 23;

(b)     Find for Plaintiffs as to all claims set forth herein;

(c)     Declare the several challenged contractual provisions of the Terms to be unenforceable and enjoin their enforcement;

(d)     Declare Defendant's fee assessment policies and practices to be violative of the contract, wrongful, and unconscionable;

(e)     Award restitution of all illicit fees and charges at issue paid to Defendant by Plaintiffs and the Class as a result of the wrongs alleged herein in an amount to be determined at trial;

(f)     Compel disgorgement of the ill-gotten gains derived by Defendant from its misconduct;

(g)     Award Plaintiffs and the Class actual, incidental, and consequential damages in an amount to be proven at trial, including any and all compensatory damages, punitive damages, restitution, any applicable penalties and interest, authorized attorneys' fees, interest, and costs, and any further relief as the Court deems just, equitable, and proper;

38

(h)     Award all reasonable costs and attorneys' fees incurred by Plaintiffs;

(i)     Order Defendant to unlock payment terminals owned by Plaintiff and the Class;

(j)     Hold a trial by jury on all matters; and

(k)     For such other and further relief as the Court may deem just and equitable.

DATED this 13th day October, 2016.

Respectfully submitted,

BY:   WEBB, KLASE & LEMOND, LLC

*/s/ E. Adam Webb*
E. Adam Webb
  Georgia Bar No. 743910
Matthew C. Klase
  Georgia Bar No. 141903
G. Franklin Lemond, Jr.
  Georgia Bar No. 141315

1900 The Exchange, S.E.
Suite 480
Atlanta, Georgia 30339
(770) 444-0773
(770) 217-9950 (fax)
Adam@WebbLLC.com
Matt@WebbLLC.com
Franklin@WebbLLC.com

*Attorneys for Plaintiffs*

39

## <u>CERTIFICATE OF SERVICE</u>

I hereby certify that on this 13th day of October, 2016, I caused the foregoing document to be electronically filed with the Clerk of Court using the CM/ECF system which automatically sends email notification of such filing to all attorneys of record.

*/s/  E. Adam Webb*
E. Adam Webb